[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10252

_____

RHONDA FLEMING,

Plaintiff-Appellee,

*versus*

UNITED STATES OF AMERICA, et al.,

Defendants,

FCI TALLAHASSEE WARDEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:20-cv-00545-WS-MJF

_____

Before ROSENBAUM, ABUDU, and WILSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

Patience is a virtue.  At least, that's the message Title 28, United States Code, Section 1291, conveys.  Section 1291 gives us jurisdiction over district courts' "final decisions."  In contrast, we ordinarily lack jurisdiction over district courts' decisions that don't end the litigation—meaning litigants must wait for a final judgment before they can appeal.  But a judge-made rule called the "collateral-order doctrine" offers a limited exception to this final-decision rule.  The collateral-order doctrine extends § 1291's jurisdictional grant to interlocutory appeals of "a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (cleaned up).  This case requires us to determine whether to expand the collateral-order doctrine to permit an immediate appeal when a district court recognizes a cause of action under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), outside the context of addressing a qualified-immunity claim.

We join all four other circuits that have considered this question in declining to move the fenceposts of the collateral-order doctrine. The doctrine is a minimal exception to the general rule that only final judgments are appealable. It covers only orders that threaten important interests that become moot if an appeal is not interlocutory. But orders recognizing *Bivens* claims, unlike orders denying immunity from those claims, do not fall into this class. So we dismiss this interlocutory appeal for lack of jurisdiction.

## I.    Factual Background

Plaintiff-Appellee Rhonda Fleming was incarcerated at Federal Correctional Institution Tallahassee ("FCIT") beginning in October 2018. Eventually, she was assigned to the A-South housing unit. According to Fleming, that's when her living conditions deteriorated so much that they significantly affected her health.

In the A-South housing unit, she alleges, mold covered the ceiling, walls, and windowsills. And it grew when rainwater repeatedly leaked in through the roof and walls.[1] A physician

---

[1] This appeal follows the district court's ruling on a motion to dismiss, so we accept the facts alleged in the complaint as true. *Myrick v. Fulton County*, 69 F.4th 1277, 1294 (11th Cir. 2023). We also take judicial notice of a recent report from the Department of Justice's Office of the Inspector General. That report corroborated much of Fleming's complaint, such as the presence of leaks, mitigated only by "patchwork repairs, including plastic covering on damaged ceiling areas and feminine-hygiene products on leaking windows," and of a "black substance" in housing units and showers. INSPECTION OF THE FEDERAL BUREAU OF PRISONS' FEDERAL CORRECTIONAL INSTITUTION TALLAHASSEE, U.S. DEPT. OF JUST. OFF. OF THE INSPECTOR GEN. at 12–17 (Nov. 2023), https://perma.cc/EHL7-QZFJ. The report describes these and other issues as

informed Fleming that these conditions caused her respiratory system "extreme distress." Fleming repeatedly complained to prison officials, including Defendant-Appellant Warden Erica Strong, but the leaks continued and the mold remained.

The dangerous conditions didn't end with mold. Fleming's complaint also alleges that her housing unit exposed her to asbestos.

And then in 2020, the COVID-19 virus raced through the prison's close quarters. Prison officers and inmates who worked in food service contracted the virus and spread it. Fleming complained to Warden Strong and filed an administrative complaint about "overcrowding and denial of space to socially distance."

But Strong's response did not stop COVID's spread. Fleming asserts that Strong failed to quarantine infected persons or maintain social distancing to slow the spread of disease. Ultimately, Fleming asserts, she contracted COVID twice. She became severely ill and required weeks of hospitalization. Another inmate died. At the hospital, Fleming's doctor determined that Fleming's "respiratory system was already in extreme distress due to the extended exposure to toxic mold" when she contracted COVID.[2]

---

"serious infrastructure problems that created unsanitary and potentially unsafe conditions." *Id.* at i. *See also* Glenn Thrush, *Justice Dept. Watchdog Describes Unsanitary Conditions at Florida Prison*, N.Y. TIMES (Nov. 8, 2023), https://perma.cc/RS2D-S894.

[2] The Centers for Disease Control have concluded that "COVID-19 likely increases the risk for fungal infections because of its effect on the immune

## II.    Procedural Background

### A.  District Court Proceedings

After lodging several complaints with prison administrators, in November 2020 Fleming filed this *pro se* suit against Defendants Federal Correctional Institution Tallahassee Warden Erica Strong, the United States, and other federal officials and agencies in district court.  The operative complaint, against only Strong and the United States, alleges violations of the Eighth Amendment's prohibition of cruel and unusual punishment.  It also asserts violations of Florida tort law.  Fleming seeks injunctive relief and damages from both Defendants under the Eighth Amendment and *Bivens* and the Federal Tort Claims Act ("FTCA").[3]

Strong and the United States moved to dismiss the complaint on several grounds, including a failure to exhaust administrative remedies, the discretionary-function exemption to FTCA liability, Strong's qualified immunity from Fleming's Eighth Amendment claim, and Fleming's failure to show an Eighth Amendment violation under the deliberate-indifference standard.

The magistrate judge recommended granting the motion to dismiss as to almost all Fleming's claims, including all her claims

---

system." *Fungal Diseases and COVID-19*, Ctrs. for Disease Control (May 8, 2024), https://perma.cc/HXX7-S7BD.

[3] Fleming also brought claims of retaliation under the First Amendment and negligent failure to protect (related to an attack by another prisoner).  The district court dismissed those claims, and they are not relevant here.

against Strong. *Fleming v. United States*, No. 4:20-cv-545, 2022 WL 17542931 (N.D. Fla. Oct. 3, 2022). Construing Fleming's Eighth Amendment claim against Strong as a "conditions-of-confinement" claim, the magistrate judge concluded that precedent precluded it. *Id.* at *8. In the magistrate judge's view, *Ziglar v. Abbasi*, 582 U.S. 120 (2017), and *Egbert v. Boule*, 596 U.S. 482 (2022), required the conclusions that Fleming's claim was distinguishable from the kind of damages claims against federal officials that the Supreme Court previously recognized and that "special factors" counseled against the provision of a judicial remedy. *Id.* at *8–9. For those reasons, the magistrate judge concluded that *Bivens* provided for no remedy here. The magistrate judge did not address qualified immunity. *Id.*

The district court partially rejected the magistrate judge's recommendation. *Fleming v. United States*, No. 4:20-cv-545, 2022 WL 17091878 (N.D. Fla. Nov. 21, 2022). The court viewed Fleming's Eighth Amendment claim against Strong as similar to the claim in *Powell v. Lennon*, 914 F.2d 1459 (11th Cir. 1990). *Id.* at *1. In *Powell*, we held that an inmate sufficiently alleged asbestos exposure to make out an Eighth Amendment claim against prison officials. 914 F.2d at 1465. So based on *Powell*, the district court concluded that a *Bivens* remedy existed for Fleming's Eighth Amendment claim against Strong. *Fleming*, 2022 WL 17091878, at *1–2. Like the magistrate judge, the district court did not address qualified immunity. *Id.*

23-10252               Opinion of the Court                    7

### B.  Strong's Appeal

Strong timely appeals the district court's order.  She makes two arguments.  First, Strong urges that we enjoy jurisdiction over this interlocutory appeal under the collateral-order doctrine.  And second, she asserts that the district court erred in failing to dismiss all Fleming's damages claims against Strong under *Bivens*, *Ziglar*, and *Egbert*.  Strong does not address the issue of qualified immunity.[4]  Fleming responds, with the help of appointed counsel, that we lack jurisdiction over this interlocutory appeal and that the district court's decision was correct, in any case.

After careful review of the record and thoughtful oral argument from both parties, we conclude that decisions recognizing *Bivens* causes of action fall outside the scope of the collateral-order doctrine.  So we dismiss this appeal for lack of jurisdiction and do not reach the merits of the district court's order.

---

[4] Like the other courts to consider cases in similar postures, we confront the issues as presented and do not probe the decision not to present a qualified-immunity argument on appeal.  We do note that Strong raised a qualified-immunity defense in her motion to dismiss the *Bivens* claims.  Because qualified immunity is a defense from suit, not just liability, *see Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), should Strong again raise a qualified-immunity defense, the district court should give it due consideration at the earliest possible time.

### III.    **Standard of Review**

We review de novo whether a complaint states a cognizable *Bivens* claim. *See Alvarez v. U.S. Immigr. & Customs Enf't*, 818 F.3d 1194, 1200 (11th Cir. 2016). Whether we enjoy jurisdiction over this interlocutory appeal "presents a question of law subject to plenary review." *SmileDirectClub, LLC v. Battle*, 4 F.4th 1274, 1277 (11th Cir. 2021) (en banc).

### IV.    **Legal Background**

Before we launch into the analysis of the question here, we take a few moments to paint the legal landscape in which today's question arises. As we've mentioned, this case involves two areas of law: (1) *Bivens* and (2) interlocutory appeals. So we divide our preliminary discussion of the applicable law in the same way. Section A briefly explains the current state of the law as it relates to *Bivens* actions. Section B discusses the collateral-order doctrine.

### A.  Bivens *Claims After* Ziglar *and* Egbert

Fleming sues under *Bivens* and its progeny. This line of cases recognizes "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). *Bivens* itself held that a plaintiff had a cause of action against federal officials who allegedly violated the Fourth Amendment by using excessive force when they engaged in a warrantless search and arrest. *Bivens*, 403 U.S. at 397.

23-10252                Opinion of the Court                9

The Supreme Court has extended *Bivens*'s implied cause of action and damages remedy twice. First, it recognized a damages claim under the Fifth Amendment's Due Process Clause in a suit against a congressman for gender discrimination in hiring. *Davis v. Passman*, 442 U.S. 228 (1979). Second, it recognized a *Bivens* claim for violations of the Eighth Amendment's Cruel and Unusual Punishments Clause when prison officials failed to transfer a severely asthmatic inmate to an appropriate facility and mistreated the inmate after an asthma attack, leading to his death. *Carlson v. Green*, 446 U.S. 14, 16 n.1, 20 (1979).

Since *Carlson*, though, the Supreme Court has stepped back from recognizing new *Bivens* actions. In *Ziglar v. Abbasi*, the Court declared that "expanding the *Bivens* remedy is now a disfavored judicial activity." *Ziglar*, 582 U.S. at 135 (internal quotation marks omitted).

Then, a few years later, in *Egbert v. Boule*, the Court summarized the two-step analysis for determining whether a *Bivens* cause of action exists. 596 U.S. at 492. "First, we ask whether the case presents a new *Bivens* context—*i.e.*, is it meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (internal quotation marks omitted). And if so, second, "a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (internal quotation marks omitted).

At the first step, many differences in context can be "meaningful." *Ziglar*, 582 U.S. at 139. For instance, we consider the "the rank of the officers involved; the constitutional right at issue; [and] the generality or specificity of the official action." *Id.* at 140. And at the second step, many "special factors" can preclude recognition of a *Bivens* cause of action. *Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). These include things like potential "'economic and governmental concerns,' 'administrative costs,' and the 'impact on governmental operations systemwide.'" *Id.* at 491. (quoting *Ziglar*, 582 U.S. at 134, 136).

The Supreme Court roots its concern with new *Bivens* actions in separation-of-powers principles. The potential effects of recognizing an implied cause of action mean that doing so implicates a "range of policy considerations . . . at least as broad as the range . . . a legislature would consider." *Id.* (omission in original) (quoting *Bivens*, 403 U.S. at 407 (Harlan, J., concurring in the judgment)). And these policy considerations, the Court has said, are Congress's meat and potatoes, not the courts'. *Id.*

### B. The Collateral-Order Doctrine

As we've mentioned, this case concerns our jurisdiction over an interlocutory appeal of a district-court order recognizing a *Bivens* cause of action. Generally, the circuit courts have jurisdiction over only "final decisions" from district courts. 28 U.S.C. § 1291. But 28 U.S.C. § 1292(b) makes some interlocutory appeals available: district courts may certify orders involving "controlling questions of law" for immediate review at the circuit court's

discretion. *See id.* And the courts have used a "practical rather than a technical" construction of § 1291 to allow interlocutory appeals of "a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final.'" *Mohawk*, 558 U.S. at 106 (cleaned up).

To determine whether a matter falls within the bounds of the "collateral-order doctrine," we look to *Cohen v. Beneficial Industries Loan Corp.*, 337 U.S. 541 (1949), which sets out three factors to consider. The three *"Cohen* factors" allow immediate appeals of only those nonfinal decisions "[(1)] that are conclusive, [(2)] that resolve important questions separate from the merits, and [(3)] that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk*, 558 U.S. at 106 (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995) (summarizing *Cohen*, 337 U.S. at 546)).

If that sounds like a severe restriction on interlocutory appeals, that's by design. The Supreme Court has repeatedly cautioned against too broad a construction of the collateral-order doctrine. Indeed, the Court has warned, the collateral-order doctrine must "never be allowed to swallow the general rule that a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Id.* at 106 (citation omitted in original) (quoting *Digit. Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)). We have also emphasized the "narrow," "limited," "modest . . . [and] selective" scope of the collateral-order doctrine. *SmileDirectClub*, 4 F.4th at 1278 (quoting *Firestone Tire & Rubber Co.*

*v. Risjord*, 449 U.S. 368, 374 (1981), *Flanagan v. United States*, 465 U.S. 259, 265 (1984), and *Will v. Hallock*, 546 U.S. 345, 350 (2006)).

As the Supreme Court has explained, the limited scope of the collateral-order doctrine reflects both "the strong bias of § 1291 against piecemeal appeals," *Digit. Equip.*, 511 U.S. at 872, and the values that the appellate-jurisdiction statutes reflect. Those values include judicial efficiency and respect for the "special role" of district-court judges in managing their cases. *Mohawk*, 558 U.S. at 106 (quoting *Firestone Tire*, 449 U.S. at 374).

This case requires us to focus on the third *Cohen* factor: whether the decision would be "effectively unreviewable on appeal" without an immediate appeal.[5] *Id.* (quoting *Swint*, 514 U.S. at 42). Of course, a delayed appeal will never put a litigant in exactly the same position they would have been in if an interlocutory appeal had been available. But too broad a view of the "effectively unreviewable" test could encompass "almost every pretrial or trial order . . . in the sense that relief from error can never extend to rewriting history." *Digit. Equip.*, 511 U.S. at 872. So the collateral-order doctrine applies only when delayed review "would imperil a

---

[5] Strong argues that the district court's order meets all three *Cohen* factors; Fleming contests only the "effectively unreviewable" prong, so that is what we review. Still, we share the Tenth Circuit's uncertainty as to whether a *Bivens*-extension order has "'complete separation' from the merits" as the second *Cohen* factor requires. *Mohamed v. Jones*, 100 F.4th 1214, 1224 n.12 (10th Cir. 2024) (quoting *Kell v. Benzon*, 925 F.3d 448, 455 (10th Cir. 2019).

substantial public interest or some particular value of a high order." *Mohawk*, 558 U.S. at 107 (internal quotation marks omitted).

Perhaps the classic type of order meriting immediate review is that denying absolute, qualified, or another immunity. These entitlements provide "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). So an immunity is "effectively lost if a case is erroneously permitted to go to trial." *Id.* Immunity doctrines also serve "compelling public ends" like preventing "disruption of governmental functions" (in the case of qualified immunity) or "honoring the separation of powers" (in the case of absolute immunity). *Will*, 546 U.S. at 352 (cleaned up). For these reasons, immunity denials are generally immediately appealable, including when they relate to a qualified-immunity defense in a *Bivens* suit. *See Mitchell*, 472 U.S. at 526. That said, the collateral-order doctrine does not allow for the immediate review of every order "denying an asserted right to avoid the burdens of trial." *Will*, 546 U.S. at 351. Rather, the order must bear on "avoidance of a trial that would imperil a substantial public interest"—like the interests immunity doctrines protect. *Id.* at 353.

Not only that, but Congress has expressed its preference that the Supreme Court expand the collateral-order doctrine through rulemaking, not case-by-case adjudications. *Mohawk*, 558 U.S. at 113. In response to a series of Supreme Court decisions expanding the collateral-order doctrine, Congress passed two laws in the early 1990s clarifying the Court's authority to promulgate rules about interlocutory appellate jurisdiction. First, the Federal Courts Study

Committee Implementation Act of 1990 allowed the Court to make general rules "defin[ing] when a ruling of the district court is final for the purposes of appeal under section 1291." Pub. L. No. 101-650, § 315, 104 Stat. 5104, 5115 (codified at 28 U.S.C. § 2072(c)). Second, the Federal Courts Administration Act of 1992 amended 28 U.S.C. § 1292 to allow the Court to "prescribe rules . . . to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for" in § 1292. Pub. L. No. 102-572, § 101, 106 Stat. 4506, 4506 (codified at 28 U.S.C. § 1292(e)).

The Court understood these reforms as urging rulemaking rather than case-by-case expansions of the collateral-order doctrine. *See, e.g.*, *Swint*, 514 U.S. at 48 (calling rulemaking "[t]he procedure Congress ordered" for defining "final" decisions); *Cunningham v. Hamilton County*, 527 U.S. 198, 210 (1999) (describing Congress's "designation of the rulemaking process as the way to define . . . when an interlocutory order is appealable" (quoting *Swint*, 514 U.S. at 48)); *Mohawk*, 558 U.S. at 114 ("Any further avenue for immediate appeal of such rulings should be furnished, if at all, through rulemaking"); *id.* at 118–19 (Thomas, J., concurring in part and in the judgment) ("Congress, which holds the constitutional reins in this area, has determined that [the] value judgments" required by *Cohen* should be made through rulemaking, not "case-by-case adjudication").

And the Supreme Court has explained why this approach makes sense. Even when we adjudicate individual cases, our approach to collateral-order expansion is "blunt [and] categorical":

we assess the appealability of "the entire category to which a claim belongs." *Mohawk*, 558 U.S. at 112, 107 (quoting *Digit. Equip.*, 511 U.S. at 883, 868). We don't conduct an "individualized jurisdictional inquiry" into the value of allowing an interlocutory appeal on any particular set of facts. *Id.* at 107 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978)). Rather, we must examine and determine whether to allow appeals of each "class of claims, taken as a whole." *Id.* And the rulemaking process—which facilitates input from all potentially interested parties and not just those that happen to be litigants in a given case—best suits that kind of broad determination. *Id.* at 114. In contrast, when a case's particulars uniquely merit immediate review, § 1292(b)'s mechanism for discretionary appeals better fits that situation.

We noted all this recently when, sitting en banc, we unanimously overturned our decades-old decision that allowed interlocutory appeals from denials of so-called "state action immunity" in Sherman Act suits. *SmileDirectClub*, 4 F.4th at 1283. We recognized that what we had colloquially called an "immunity" doctrine was in fact just a "strict standard for locating the reach of" federal antitrust law that did not reflect a "value of sufficiently high order" to merit immediate review. *Id.* at 1279, 1282. In other words, so-called "state action immunity" wasn't immunity at all; it was a shorthand (and incorrectly imprecise) way of saying, on the merits, that the Sherman Act did not reach government action. That the "negative consequences" of allowing too many interlocutory appeals were significant enough to warrant reversing a decades-old precedent

16                    Opinion of the Court                    23-10252

shows the importance we place on policing the boundaries of the collateral-order doctrine. *Id.* at 1285 (Pryor, C.J., concurring).

## V.    Discussion

Every other circuit that has considered whether *Bivens*-recognition and -extension orders[6] fall within the collateral-order doctrine when they don't arise in the context of an appeal from the denial of qualified immunity—four in all—has concluded they don't. Today, we join them.

The collateral-order doctrine permits interlocutory appeals from only a small set of orders. To the extent the doctrine should be broadened beyond its existing borders to categories of other types of orders, we agree with the Supreme Court's suggestion that rulemaking is the way to do it. No Supreme Court precedent says that the collateral-order doctrine allows interlocutory appeals from *Bivens*-extension orders in their own right. And in fact, the Court has suggested the opposite. Most importantly, *Bivens*-

---

[6] The district court here determined that Fleming's Eighth Amendment claim was similar enough to a previously recognized *Bivens* claim to proceed. *Fleming*, 2022 WL 17091878, at *1. That is, the district court did not extend *Bivens* at all. Instead, it recognized what it viewed as an existing *Bivens* remedy. *Id.* Strong asks us to recognize an expansive right of interlocutory appeal from not just *Bivens*-extension orders but really any order recognizing a *Bivens* remedy, even when a district court determines the facts at hand are substantially identical to those in a recognized *Bivens* claim. Because we think the same principles limiting interlocutory appeals of *Bivens*-extension orders apply with at least as much force to *Bivens*-recognition orders, and because nearly all the relevant precedent involves *Bivens*-extension orders, we refer throughout the rest of the opinion to *Bivens*-extension orders.

23-10252              Opinion of the Court                    17

extension orders rarely (if ever) jeopardize the kinds of urgent and weighty interests that require the protection of instantaneous review. And if they do in a particular case, qualified immunity well protects those interests.

### A. Supreme Court precedent has not extended the collateral-order doctrine to cover this case.

We first consider Supreme Court precedent. Strong argues that the Court has viewed *Bivens*-extension orders as "immediately appealable collateral orders in their own right." We disagree. In fact, the Court's decisions show otherwise. No Supreme Court case holds that *Bivens*-extension orders fall within the scope of the collateral-order doctrine.[7] To be sure, in the context of analyzing some interlocutory appeals, the Supreme Court has opined on whether the *Bivens* remedy should be extended. But it has done so on interlocutory appeal only as a part of its analysis of whether a defendant is entitled to qualified immunity—that is, whether the officer violated a clearly established right of the plaintiff. So to the

---

[7] In three of the panels in other circuits that have tackled this issue, one judge dissented. *Graber v. Doe II*, 59 F.4th 603, 611 (3d Cir. 2023) (Hardiman, J., dissenting); *Mohamed v. Jones*, 100 F.4th 1214,1235 (8th Cir. 2024) (Tymkovich, J., dissenting); *Garraway v. Ciufo*, 113 F.4th 1210, 1222 (9th Cir. 2024) (Bumatay, J., dissenting). But tellingly, at least two dissents acknowledge that the Supreme Court has not extended the collateral-order doctrine to *Bivens* extensions orders. *See Graber*, 59 F.4th at 611 (Hardiman, J., dissenting) ("It's hard to predict how the Supreme Court would resolve this conflict."); *Mohamed*, 100 F.4th at 1241 (Tymkovich, J., dissenting) (describing the possibility of "recogniz[ing] *new* collaterally appealable orders." (emphasis added)).

extent the Court has reviewed *Bivens*-extension orders in an interlocutory context, it's explained that qualified immunity, not a *Bivens* extension, has provided the jurisdictional hook.

Take *Hartman v. Moore*, 547 U.S. 250 (2006). There, the plaintiff sued postal inspectors under *Bivens* for First Amendment violations in the form of an allegedly retaliatory criminal prosecution. 547 U.S. at 252–55. The postal inspectors moved for summary judgment on qualified-immunity grounds. *Id.* at 255. That meant they had to show that (1) the defendants violated their First Amendment rights, and (2) those rights were clearly established at the time the defendants violated them.

After the district court denied the motion, the D.C. Circuit affirmed in an interlocutory appeal. *Id.* The circuit court's decision focused on whether establishing a violation of the plaintiff's rights—the first element of the qualified-immunity test—required a retaliatory-prosecution *Bivens* plaintiff to show that government officials lacked probable cause for the prosecution. *Moore v. Hartman*, 388 F.3d 871, 877 (D.C. Cir. 2004). The circuit court determined that the existence of probable cause did not preclude a retaliatory-prosecution *Bivens* claim (under clearly established law), so the defendants' claim that they had probable cause for the prosecution did not give them qualified immunity. *Id.* at 878–86.

The Supreme Court granted certiorari and held that retaliatory-prosecution *Bivens* plaintiffs must show that the defendants lacked probable cause when they prosecuted the plaintiffs. *Hartman*, 547 U.S. at 265–66. In reaching this conclusion, the Court

rejected the argument that it had "exceeded its appellate jurisdiction" by reaching a merits issue on appeal from a denial of qualified immunity. *Id.* at 257 n.5. The Court acknowledged that its holding went to the substance of the *Bivens* claim. *Id.* But, it concluded, reaching that issue was jurisdictionally proper because that issue was "directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal." *Id.* At no point did the Court suggest that interlocutory appeal was appropriate simply because the case involved an extension of *Bivens*.

Next up, in *Wilkie v. Robbins*, 551 U.S. 537 (2007), the Court heard a case about a *Bivens* claim for Fifth Amendment violations by Bureau of Land Management employees "accused of harassment and intimidation aimed at extracting an easement across private property." 551 U.S. at 541. The district court denied the employees' motion to dismiss (and their motion for summary judgment) on qualified-immunity grounds. *Id.* at 548–49. The government defendants appealed up to the Supreme Court.

As in *Hartman*, the Court reached the *Bivens* issue only by traveling the qualified-immunity road. In the context of resolving the qualified-immunity issue, the Court held that special factors counseled against recognition of the plaintiff's *Bivens* action. *Id.* at 550–62. As the Court expressly explained, it found its interlocutory jurisdiction based on the "the same reasoning" as in *Hartman*. *Id.* at 549 n.4. In other words, the decision to recognize a *Bivens* cause of action was "directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal," just like

the determination of the required elements of the claim in *Hartman*. *Id.* (quoting *Hartman*, 547 U.S. at 257 n.5).  So the Court (and the court of appeals) had jurisdiction over the defendants' interlocutory appeal.  *Id.*  Far from indicating that *Bivens*-extensions orders are "immediately appealable orders in their own right," the Court explained that the orders were appealable because they involved qualified immunity.

Finally, because Defendants invoke them, we take a moment to discuss the Court's two decisions in the *Hernandez v. Mesa* litigation.  In that litigation, the parents of a Mexican teenager brought a *Bivens* claim against a Border Patrol agent who shot their son across the border.  *Hernandez v. Mesa* (*Hernandez I*), 582 U.S. 548, 550 (2003) (per curiam).  But as we explain below, the *Hernandez* decisions never dealt with the collateral-order doctrine at all, so they do not bear on our inquiry here.

The district court dismissed all the plaintiffs' claims, and the plaintiffs appealed.  *See Hernandez v. United States*, 802 F. Supp. 2d 834, 846–47 (W.D. Tex. 2011); *Hernandez v. Mesa*, No. EP-11-CV-331-DB, slip op. at 9 (W.D. Tex. Feb. 17, 2012); *Hernandez v. United States*, 757 F.3d 249, 254–57 (5th Cir. 2014).  Because the district court dismissed all the plaintiffs' claims, by definition, the appeal to the Fifth Circuit was not an interlocutory appeal; it was an appeal from a final decision.  *See Hernandez v. United States*, 757 F.3d at 257 n.5.  As a result, nothing that the Fifth Circuit decided bore on the collateral-order doctrine.

On appeal to the Fifth Circuit, a panel of that court held that the plaintiffs' complaint against the Border Patrol agent failed to state a Fourth Amendment violation. But the court concluded that the complaint did state a Fifth Amendment claim for which a *Bivens* remedy was available, and qualified immunity did not shield that claim. *Id.* at 256–57, 263–80. The Fifth Circuit reheard the case en banc and agreed as to the dismissal of the Fourth Amendment claim but reversed on the Fifth Amendment decision, holding that the Border Patrol agent was entitled to qualified immunity on that claim. *Hernandez v. United States*, 785 F.3d 117, 121 (5th Cir. 2015) (en banc) (per curiam). The plaintiffs appealed, and the Supreme Court granted certiorari. *Hernandez v. Mesa*, 580 U.S. 915 (2016).

The Court vacated the Fifth Circuit's decision as to the Fourth Amendment and directed it to examine whether the then-recent *Abbasi* decision meant the case should be dismissed for lack of an available remedy under *Bivens*, rather than on Fourth Amendment grounds directly. *Hernandez I*, 582 U.S. at 553–54. As for the Fifth Amendment claim, the Court identified an error in the Fifth Circuit's reasoning for its grant of qualified immunity and vacated that decision. *Id.* at 554–55.

On remand, the Fifth Circuit determined that the national-security implications of the transnational shooting were a "special factor[]" that foreclosed both Fourth and Fifth Amendment *Bivens* remedies under *Abbasi*. *Hernandez v. Mesa*, 885 F.3d 811, 814–15 (5th Cir. 2018). When the plaintiffs appealed, the Supreme Court again granted certiorari and affirmed the Fifth Circuit's *Bivens* analysis.

22                    Opinion of the Court                  23-10252

*Hernandez v. Mesa* (*Hernandez II*), 589 U.S. 93, 96–99 (2020).  In neither *Hernandez I* nor *II* did any party or court invoke the collateral-order doctrine.  Nor could they have because the underlying appeal to the circuit court and both appeals to the Supreme Court were from indisputably "final decisions" dismissing all the plaintiffs' claims.  For that reason, the *Hernandez* litigation is not instructive here.  *See also Mohamed*, 100 F.4th at 1233 n.4 (discussing *Hernandez*'s procedural history).

In short, the Supreme Court has never previously recognized a right of interlocutory appeal in a case like this.  If we were to hear such an appeal, it would not just invoke but extend the collateral-order doctrine.  We now discuss why our sister circuits declined to expand the collateral-order doctrine to cover *Bivens*-extension orders and explain why we agree.

> *B.  All four circuits to consider the question have agreed: interlocutory appeals are unavailable for* Bivens-*extension orders.*

Before beginning our own analysis, we consider the other cases where four of our sister circuits have recently analyzed the very issue we face here.  In each case, a district court declined to dismiss a *Bivens* suit under *Ziglar* and *Abbasi*.  Each defendant appealed the recognition of a *Bivens* action but did not raise a qualified-immunity challenge on appeal.  And each circuit court held that it lacked jurisdiction under the collateral-order doctrine.

We start with *Himmelreich v. Federal Bureau of Prisons*, 5 F.4th 653 (6th Cir. 2021).  There, the Sixth Circuit considered an appeal

from an order that partially denied a *Bivens* defendant's motion for summary judgment. The district court had concluded that, although the claims presented a new *Bivens* context, no special factors foreclosed a cause of action. *Himmelreich v. Fed. Bureau of Prisons*, No. 10-2404, 2019 WL 4694217, at *1 (N.D. Ohio Sept. 25, 2019). But "for some unexplained reason," the defendant had waived her qualified-immunity defense. *Himmelreich*, 5 F.4th at 658, 661.

The Sixth Circuit held that it lacked jurisdiction over the interlocutory appeal under § 1291. *Id.* at 656. First, the court considered *Wilkie* and similar cases. But it found them unhelpful because appellate jurisdiction there was "anchored . . . in the defendants' appeal of the . . . denial of qualified immunity." *Id.* at 661. So the court turned to the three *Cohen* factors to assess whether it enjoyed interlocutory jurisdiction. At the third *Cohen* factor, the Sixth Circuit determined that the order was not "effectively unreviewable" on appeal from final judgment. That was so, the court reasoned, because, among other reasons, *Bivens* "provides a plaintiff's remedy" rather than a defendant's immunity that would be lost if a case proceeded to trial, and the merits of a *Bivens* claim could be effectively reviewed after final judgment. *Id.* at 662.

The Third Circuit next took up the issue in *Graber v. Doe II*, 59 F.4th 603 (3d Cir. 2023). The district court in *Graber* denied a *Bivens* defendant's motion to dismiss claims that the court concluded did not arise in a new *Bivens* context and, in any event, presented no special factors counseling against recognition of a cause of action. *Id.* at 607. Later, the district court denied the defendant's

24                    Opinion of the Court                    23-10252

motion for summary judgment on qualified-immunity grounds. *Id.* The defendant then appealed the court's decision permitting the *Bivens* claim (but waived his challenge to the immunity ruling). *Id.*

A divided Third Circuit panel held it lacked jurisdiction over the appeal. As the Sixth Circuit did in *Himmelreich*, the Third Circuit emphasized the different aims of immunity doctrines and *Bivens*. It noted that *Bivens* concerns "whether courts should be in the business of creating avenues for liability, which is distinct from whether a defendant is immune from suit altogether." *Id.* at 609. And, the court reasoned, the liability issue, versus immunity from suit, could be "effectively reviewed" after final judgment. *Id.* at 610. So the Third Circuit declined to expand the collateral-order doctrine to include *Bivens*-extension orders.

Next, the Tenth Circuit addressed the appealability of *Bivens*-extension orders in its thorough and thoughtful decision in *Mohamed v. Jones*, 100 F.4th 1214 (10th Cir. 2024). The suit dealt with a variety of Eighth Amendment *Bivens* claims against federal Bureau of Prisons officials as well as FTCA claims against the United States. The individual defendants moved to dismiss. Some asserted that *Bivens* provided no remedy for the claims against them, and another argued for qualified immunity. *Id.* at 1217. The district court denied the defendants' motion, concluding (as relevant here) (1) that the defendant seeking qualified immunity was not entitled to it, (2) that the relevant claims did "not present a new *Bivens* context, and [(3)] that no special factors counsel[ed] against

recognizing a *Bivens* claim." *Mohamed v. Huddleston*, No. 20-cv-02516, 2022 WL 22353363, at *3–4 (D. Colo. May 18, 2022). The defendants appealed. But in doing so, none raised qualified-immunity arguments, instead challenging only the recognition of a *Bivens* remedy. *Mohamed*, 100 F.4th at 1217.

A divided Tenth Circuit panel, like the Third and Sixth Circuits before it, held that it lacks jurisdiction over the interlocutory appeal of a *Bivens*-extension order when qualified immunity is not at issue. The Tenth Circuit based its decision on several considerations: the narrowness of the collateral-order doctrine, *id.* at 1225; the inapplicability of Supreme Court precedents that happened to involve review of *Bivens* extensions but did so only because the interlocutory appeals were based on a denial of qualified immunity, *id.* at 1235; *Bivens*'s purpose of discouraging and remediating federal officials' misconduct rather than protecting those officials from suit, *id.* at 1229–31; and the judicial inefficiencies that might arise from allowing interlocutory appeals of *Bivens*-extension orders. *Id.* at 1228. The Tenth Circuit also noted Congress's preference for the courts to use rulemaking rather than case adjudication to determine which types of orders are subject to interlocutory appeals. *Id.* at 1227. Last, the court pointed out that *Bivens* defendants had another avenue for interlocutory appeal: seeking permission under 28 U.S.C. § 1292(b). *Id.*

Finally, the Ninth Circuit joined this chorus in *Garraway v. Ciufo*, 113 F.4th 1210 (9th Cir. 2024). There, the district court denied a motion to dismiss a *Bivens* action on the ground that the

26                          Opinion of the Court                          23-10252

claims did not present a new *Bivens* context. *Id*. at 1214. So the defendants appealed. *Id*. A divided panel held it lacked jurisdiction. *Id*. at 1221–22. Its reasons were by now familiar: interlocutory appeals are available only in limited circumstances, *id*. at 1215; Congress has directed rulemaking as the preferred way to expand those circumstances, *id*. at 1221; and qualified immunity, not the *Bivens* remedy, protects government defendants, so decisions about qualified immunity, not *Bivens* extensions, warrant immediate review. *Id*. at 1217–21.

We would not shy away from creating a circuit split if we thought the issue warranted it. But we see no reason to break from our sister circuits here. *Cf. Pub. Health Tr. v. Lake Aircraft, Inc.*, 992 F.2d 291, 295 n.4 (11th Cir. 1993) ("[I]ntercircuit splits on points of law are not all bad. Still, we do listen to other courts."). We agree with their reasoning and hold that *Bivens*-extension orders that don't present a qualified-immunity issue are not immediately appealable under the collateral-order doctrine. We further explain our thinking below.

### C. *The collateral-order doctrine should not be extended to include* Bivens-*extension orders.*

To fall within the scope of the collateral-order doctrine, an order must be "effectively unreviewable on appeal" from a final judgment. *Mohawk*, 558 U.S. at 106 (quoting *Swint*, 514 U.S. at 42). But *Bivens*-extension orders that don't involve qualified-immunity issues don't undermine the sorts of interests that justify expanding

a doctrine that we and the Supreme Court have time and again warned against broadening.

The problem with allowing interlocutory appeals of *Bivens*-extension orders is not their significance but their urgency, or to be more precise, their lack of it. Qualified immunity and its immediate review sufficiently protect the interests of *Bivens* defendants and the executive branch. As for other separation-of-powers concerns with *Bivens* extensions, they do not spoil when a case is allowed to proceed to trial. So we conclude that *Bivens*-extension orders seldom (if ever) slip through the narrow opening the collateral-order doctrine creates for interlocutory appeal. As a result, we lack jurisdiction over this appeal.

> *i.* The collateral-order doctrine allows interlocutory appeals of only decisions that jeopardize interests that are both important and time-sensitive.

As we've discussed, the collateral-order doctrine permits interlocutory appeals of a small class of decisions that would be "effectively unreviewable" if appeal waited until after trial. *Mohawk*, 558 U.S. at 106. Decisions about immunities, we've noted, are the classic example of "effectively unreviewable" decisions: an immunity from trial is lost if the case proceeds to trial. But the Supreme Court has emphasized that not every asserted right to avoid trial justifies immediate appeal: only when a trial would "imperil a substantial public interest" is immediate review necessary. *Will*, 551 U.S. at 353.

In *Will v. Hallock*, the Supreme Court elaborated on this prin-
ciple and even signaled how the collateral-order doctrine applies in
cases like this one. *Will* addressed whether the collateral-order doc-
trine applied to a district court's denial of *Bivens* defendants' motion
for judgment based on the FTCA's judgment bar. *Id.* at 347. The
FTCA bars *Bivens* suits after a judgment in an FTCA action "by rea-
son of the same subject matter." *Id.* at 348 (quoting 28 U.S.C.
§ 2676). In *Will*, a court had dismissed, on procedural grounds, the
*Will* plaintiff's FTCA suit against the United States. *Id.* The de-
fendant federal agents then sought to apply the FTCA's judgment
bar in the related *Bivens* suit against them. *Id.* The district court
held that procedural dismissals don't trigger the judgment bar, so
it refused to dismiss the *Bivens* suit. *Id.* at 348–49. On an interloc-
utory appeal, the Second Circuit affirmed after finding it enjoyed
jurisdiction under the collateral-order doctrine. *Id.*

The Supreme Court reversed. It held that the district court's
order was not immediately appealable, so the circuit court had
lacked jurisdiction. *Id.* at 349. The Court emphasized that under
*Cohen*, for an order to be "effectively unreviewable" at the end of
district-court litigation, it's not enough for the order to concern
"mere avoidance of a trial." *Id.* at 353. Rather, the order must bear
on "avoidance of a trial that would imperil a substantial public in-
terest." *Id.*

With this touchstone underfoot, *Will* found an important
difference between the judgment bar and qualified immunity, and
it rejected the analogy between the two: while qualified immunity

facilitates the public's interest in preserving government officials' "initiative" despite unclear law, the Court observed, the judgment bar prevents duplicative litigation. *Id.* Then the Court unanimously rejected the idea that every shield against suit deserves interlocutory review:

> [I]f simply abbreviating litigation troublesome to Government employees were important enough for *Cohen* treatment, collateral order appeal would be a matter of right whenever the Government lost a motion to dismiss under the Tort Claims Act, *or a federal officer lost one on a* Bivens *action*, or a state official was in that position in a case under 42 U.S.C. § 1983, or *Ex parte Young*. In effect, 28 U.S.C. § 1291 would fade out whenever the Government or an official lost an early round that could have stopped the fight.

*Id.* at 353–54 (emphasis added) (citation omitted). For two reasons, *Will*'s words weigh heavily upon us when we consider expanding the collateral-order doctrine to encompass a new type of order.

First, *Will* indicates a clear stance against interlocutory appeal every time "a federal officer los[es] [a motion to dismiss] on a *Bivens* action." *Id.* at 354. To be sure, *Will*'s guidance appears in dicta. But as we've said more than once, "[T]here is dicta and then there is dicta, and then there is Supreme Court dicta." *Johnson v. Terry*, 119 F.4th 840, 861 n.7 (11th Cir. 2024) (alteration in original) (quoting *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006)). The last category is "not something to be lightly cast aside," and we do

not think it apt to do so here without a clear justification. *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997).

Second, *Will* shows that we look to the rationale for a doctrine, not just its effects, to understand the interests it protects and thus whether that interest warrants interlocutory appeal. Denials of immunity receive immediate review because immunity exists to limit officials' exposure to trial. Officials' interest in avoiding trial justifies immediate review because the interest is not just substantial but also time-bound: "a quick resolution . . . is essential" to fulfill the goals of the qualified-immunity doctrine. *Will*, 551 U.S. at 353. That is, without immediate review, qualified immunity wrongfully denied would be altogether lost and unrecoverable, at least as to the immunity from suit. But not all reasons for dismissal require such speedy review.

So we examine the interests at stake in allowing an interlocutory appeal here to see whether "delaying review until the entry of judgment would imperil a substantial public interest or some particular value of a high order." *SmileDirectClub, LLC*, 4 F.4th at 1282 (citation and internal quotation marks omitted). We keep in mind that what matters is not just the weight of the "interest" or "value" but the extent to which it "effectively may be reviewed and corrected if and when final judgment results." *Cohen*, 337 U.S. at 546. "The crucial question . . . is not whether an interest is important in the abstract; it is whether deferring review until final judgment so imperils the interest as to justify the cost of allowing immediate appeal of the entire class of relevant orders." *Mohawk*,

558 U.S. at 108. Interlocutory appeals are not for issues that are merely important; they are for issues that are important, *now*.

Defendants argue that *Bivens*-extension orders jeopardize interests that need the special protection of the collateral-order doctrine. But when we examine the interests at stake, we disagree. Below, we first describe the separation-of-powers interests *Bivens* extensions allegedly threaten. We then explain that qualified immunity well protects any time-sensitive executive-branch interests, and any legislative interests are not time-sensitive so as to justify immediate review.

> ii. Bivens-*extension orders touch on executive*
> *and legislative interests, but those interests do*
> *not justify interlocutory appeals.*

Strong argues that an interlocutory appeal of the *Bivens*-extension order here is necessary to protect a cluster of "separation of powers" interests. In particular, Strong emphasizes, the Supreme Court has said that recognizing a new *Bivens* remedy presents a threat to the "separation of legislative and judicial power." *Egbert*, 596 U.S. at 491 (quoting *Hernandez II*, 589 U. S at 100). Because "creating a cause of action is a legislative endeavor," doing so touches on Congress's legislative prerogatives and "places great stress on the separation of powers." *Id.* at 491, 497 n.3 (quoting *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 636 (2001) (plurality opinion)). So the "special factors" test for whether courts should recognize a new *Bivens* remedy focuses on whether Congress or the judiciary is

better situated to decide whether to permit a *Bivens* remedy on any given set of facts. *Id.* at 491–92.

The special-factors inquiry protects the separation of Congress and the courts. But the special factors themselves concern the functioning of the executive branch. For instance, courts must be wary of how extending *Bivens* would affect "economic and governmental concerns, administrative costs, and the impact on governmental operations systemwide." *Id.* at 491 (cleaned up) (quoting *Ziglar*, 582 U.S. at 134, 136). And the Supreme Court has warned that undermining "the initiative of [federal] officials" to act in the face of uncertainty presents perhaps the greatest risk. *Will*, 546 U.S. at 352–53. Personal liability, the theory goes, might "deter[]" officers "from carrying out their duties."[8] *Egbert*, 596 U.S. at 499 (internal quotation marks omitted). In Strong's words, "an immediate appeal protects both Congress's prerogatives to enact causes of action and federal officials' abilities to discharge their duties."

We agree that both interests are important. But as we explain, neither justifies interlocutory appeal of *Bivens*-extension orders.

---

[8] We note, though, that even when *Bivens* plaintiffs receive a damages award or settlement payment, the funds rarely come from federal officials' own pockets. *See* James E. Pfander, Alexander A. Reinert & Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When* Bivens *Claims Succeed*, 72 STAN. L. REV. 561 (2020).

> 1. *Qualified-immunity doctrine adequately protects federal officials' interests against* Bivens *suits.*

To be sure, the threat of trial—and ultimately, liability—may impact a federal official's conduct.  That is, after all, the point.  "[T]he purpose of *Bivens* is to deter *the officer*." *FDIC v. Meyer*, 510 U.S. 471, 485 (1994).

So a different doctrine sustains federal officers' "initiative" in the face of legal threats: qualified immunity.  Qualified immunity shields government officials performing discretionary functions so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mitchell*, 472 U.S. at 517 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity provides an "*immunity from suit* rather than a mere defense to liability; and . . . is effectively lost if a case is erroneously permitted to go to trial."  *Id*. at 526.  And pretrial denials of qualified immunity are immediately appealable because the right qualified immunity protects would be lost were the appeal to be delayed until after trial.  *Id.* at 536.

Like our sister circuits, we think that "qualified immunity . . . adequately protects government officials from the burdens of litigation." *Himmelreich*, 5 F.4th at 662; *Mohamed*, 100 F.4th at 1230; *Garraway*, 113 F.4th at 1221.  As an immunity doctrine—crafted to shield defendants from trial—it is a natural fit for interlocutory appeal.  Qualified immunity is a defense available to every *Bivens* defendant.  And district courts should resolve qualified-immunity

claims at the earliest possible juncture. So even if the district court errs in recognizing a *Bivens* cause of action, a *Bivens* defendant can immediately appeal if a district court denies his motion to dismiss on qualified-immunity grounds.

By contrast, *Bivens* is a plaintiff's cause of action. It is not a defense like qualified immunity. The point of *Bivens*—like any cause of action—is to deter the defendants from harming would-be plaintiffs and to provide a remedy if deterrence fails. So expanding the collateral-order doctrine to cover *Bivens*-extension orders would use a *plaintiff's* remedy as a basis for protecting defendants' interests. We don't think that fits within the narrow collateral-order doctrine's exception to the final-decision-appeal rule.

Strong argues that the qualified-immunity doctrine and the opening it provides for immediate appeal cannot change the analysis of whether *Bivens* extensions fall under the collateral-order doctrine. The separation-of-powers limitation on new *Bivens* actions, Strong asserts, would be "hollow if it does nothing but duplicate pre-existing immunity from suit." *United States v. Stanley*, 483 U.S. 669, 686 (1987). But the redundant view is precisely the one Strong would have us adopt: that separation-of-powers concerns with new *Bivens* actions implicate the same parties and interests as qualified immunity, so *Bivens*-extension orders enjoy qualified immunity's privilege of interlocutory review.

Rather than hollow out the separation-of-powers concerns with new *Bivens* claims, we give those concerns force by

recognizing their distinctiveness from qualified immunity and considering how the collateral-order doctrine applies.

> 2. *Bivens*-extension orders do not jeopardize time-sensitive interests of the legislature.

As we've noted, the primary separation-of-powers issue in recognizing a new *Bivens* context is the potential to infringe on the legislature's power. *See Egbert*, 596 U.S. at 491. This understanding is as old as *Bivens* itself. *See Bivens*, 403 U.S. at 396 ("The present case involves no special factors counseling hesitation in the absence of affirmative action by Congress."); *see also id.* at 411–12 (Burger, C.J., dissenting) ("We would more surely preserve the important values of the doctrine of separation of powers . . . by recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power."). And it continues to animate the Supreme Court's most recent *Bivens* cases. *See Egbert*, 596 U.S. at 486 ("[I]n all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts"); *Ziglar*, 582 U.S. at 136 ("[T]he [special-factors] inquiry must concentrate on whether the Judiciary is well suited, absent *congressional* action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." (emphasis added)).

True, the Court has also noted the potential "burdens on Government employees" as a reason to hesitate before recognizing a *Bivens* action. *Ziglar*, 582 U.S. at 136. But these burdens—the same as those informing the creation of qualified immunity—are

relevant in the *Bivens*-extension context only as one of the policy "considerations" that a court would have to weigh before recognizing a new *Bivens* claim (and which, of course, the Court has told us are to be settled mostly by Congress). *See, e.g.*, *Egbert*, 596 U.S. at 491. So while the special-factors inquiry may look at some of the same issues as qualified immunity, it sees them from a different perspective: that of Congress, not of defendants or the executive branch.

From this, two points follow. First, as we've noted, qualified immunity and interlocutory appeals of qualified-immunity orders better address concerns with *Bivens* actions' impact on officers' "initiative." And second, our understanding of the separation-of-powers risks involved in *Bivens*-extension orders informs our collateral-order analysis—especially whether those risks are time-sensitive so as to require prejudgment review.

We conclude that the separation-of-powers risks that *Bivens*-extension orders raise don't justify interlocutory appeal. For starters, *Will* shows that not all decisions touching on separation-of-powers issues merit interlocutory appeal.

A comparison with *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and other cases where separation-of-powers issues justified immediate appeal shows why interlocutory appeal is unavailable here. Strong asserts that *Nixon* suggests that any "threatened breach" of the separation of powers merits "special solicitude" in the form of an immediate appeal. 457 U.S. at 743. But *Nixon* shows no such thing. To the contrary, *Nixon* presents *immunity* issues, not

separation-of-powers concerns generally, as central to the right of interlocutory review.

Nixon arose out of a former Air Force analyst's suit against President Nixon for an allegedly retaliatory firing. *Id.* at 733–41. There, the Court afforded "special solicitude" "due to claims alleging a threatened breach *of essential Presidential prerogatives* under the separation of powers." *Id.* at 743 (emphasis added). But threats to the President's prerogatives are a unique separation-of-powers issue. The President's position in our constitutional structure demands "energetic, vigorous, decisive, and speedy" action. *Trump v. United States*, 603 U.S. 539, 610 (2024) (quoting *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring in judgment)). So the President claimed immunity from suit, and the Supreme Court found that claim worthy of immediate review. *Nixon*, 457 U.S. at 741; *see also id.* at 743 n.23 ("The immunity question is a pure issue of law, appropriate for our immediate resolution.").

Nixon teaches the same lesson as other cases addressing interlocutory review of immunity decisions: immunities promote speedy action by government officials faced with uncertainty. And similarly speedy review of immunity decisions is available to that end. But no immunity claim is on appeal here, only a *Bivens*-extension order.

And the alleged separation-of-power harms to the legislature in the *Bivens*-extension context are qualitatively different than those to the President in *Nixon* and other executive-branch cases. Simply put, we see no reason that whatever legislative injuries a *Bivens*-

extension order inflicts grow worse without immediate review. Congress does not face an impending trial. Congress does not participate in the suit at all. And Congress's power to modify or recognize a cause of action does not diminish if a court reviews a *Bivens*-extension order years rather than months later. In fact, delayed review might enhance the legislature's voice by giving it more time to act before an appellate court speaks on the issue. Strong points to general "separation of powers" interests to justify interlocutory appeal, but she gives us little reason to think that those interests come with an expiration date sometime between a district court's initial *Bivens*-extension decision and its final judgment.

This case also contrasts with *Shoop v. Twyford*, the Supreme Court's most recent recognition of a new category of immediately appealable order. 596 U.S. 811 (2022). *Shoop* concerned a vertical separation-of-powers question: when a federal court can order transport of a state prisoner under the All Writs Act. *Id.* at 824. As part of its 5–4 decision, the Court held that the circuit court properly took jurisdiction of an interlocutory appeal granting a prisoner-transport order. *Id.* at 817 n.1. By temporarily requiring the state to take an inmate out of prison, "[s]uch an order creates public safety risks and burdens on the State that cannot be remedied after final judgment." *Id.* The Court further cited a prisoner escape during one such movement as evidence that "[t]hese risks are not speculative." *Id.* at 822 n.2.

In comparison, the purported immediate harms of a *Bivens*-extension order aren't just speculative, they're illogical.  Unlike in the All Writs Act context, where state agents may be ordered to take action, with a *Bivens*-extension order, the legislature is not ordered to do or not do anything, and the defendant is still able to assert a qualified-immunity defense.

*Will*, too, offers no support for the notion that just any separation-of-power issue warrants interlocutory appeal.  That case cited *Nixon* to show how a denial of immunity—the President's—implicated "compelling public ends rooted in the separation of powers."  *Will*, 546 U.S. at 352 (cleaned up) (quoting *Nixon*, 457 U.S. at 758, 749).  *Will* noted only that immunity doctrines implicate the separation of powers, not that any separation-of-powers issue is subject to immediate appeal.  Even supposing a particular order's impact on the separation of powers is "substantial," *see Mohawk*, 558 U.S. at 107, that impact still must be immediate and irreparable in a way that requires instantaneous review.

We think this case is exactly what the *Will* Court had in mind when it envisioned the need to limit the scope of the collateral-order doctrine so interlocutory appeal doesn't become "a matter of right whenever . . . a federal officer los[es] [a motion to dismiss] on a *Bivens* action."  *Will*, 546 U.S. at 353–54.

Finally, the Supreme Court's recent separation-of-powers analysis in *Axon Enterprise, Inc. v. FTC* does not affect our conclusion.  598 U.S. 175 (2023).  Strong's reply briefly invokes *Axon* for the proposition that "a court 'can do nothing' to retroactively cure

harms flowing from a separation-of-powers violation."   In other words, Strong complains that she enjoys no retroactive remedy for having to undergo a *Bivens* adjudication for an implied cause of action that Congress, not the courts, should recognize, so she is entitled to an immediate appeal.   But this overreads *Axon*, which in any event is not on point here.

*Axon* addressed whether respondents in administrative actions had to raise constitutional challenges to the prosecuting agencies' structures in agency proceedings (later reviewable in a court of appeals, according to the applicable statutory review schemes) or whether they could bring collateral and immediate challenges in district court to enjoin the enforcement action.  *Id.* at 180–83.

The Court held that district courts had jurisdiction over such challenges.  *Id.* at 196.  It analyzed the issue under the *Thunder Basin* test for determining whether a statutory-review scheme precludes district-court jurisdiction over challenges to agency action.  *Id.* at 185; *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).  The *Thunder Basin* test asks in part whether "precluding district court jurisdiction [would] 'foreclose all meaningful judicial review'" of the claims, somewhat echoing *Cohen's* "effectively unreviewable" prong.  *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212–13).  The Court analogized respondents' claimed harm—"subjection to an illegitimate proceeding, led by an illegitimate decisionmaker"—to the harms that "immunity doctrines" are designed to prevent: in both cases, the harm flows from being required to participate in the adjudicatory proceeding itself, not its result.  *Id.*

at 191–92.  The Court concluded that this injury justified allowing the respondents to sue in the district court rather than waiting for their claims to be heard on appeal from the agency proceeding.  *Id.* at 196.

Strong seems to read *Axon* as providing a rule for all "separation-of-powers violation[s]."  But the violation in *Axon* and its resultant harm were severe: subjection to a wholly illegitimate, "unconstitutionally structured decisionmaking process."  *Id.* at 192. The respondents argued that the entities conducting the proceedings (administrative law judges and the agencies) had no legitimate governmental authority.  *Id.* at 193.

It is true that both this case and *Axon* deal with asserted separation-of-powers violations.  But the alleged violations are very different.  Strong hardly claims that the district court is an "illegitimate decisionmaker" or that the proceeding is entirely "illegitimate."  (After all, it is undisputed that the district court is the appropriate forum to determine in the first instance whether a constitutional remedy exists.  Strong just disagrees with the district court's decision.)  Strong's asserted injury here is having to spend more time before a judge than she wishes; the alleged injury in *Axon* was like being tried by a sports referee who has decided of his own accord to put on judicial robes.

*Axon* is also irrelevant here because it dealt with a different question: when respondents to administrative enforcement actions can bring a collateral challenge in district court.  The standards for interlocutory appeal are different, and the *Axon* Court even said

that "[n]othing we say today portends newfound enthusiasm for interlocutory review." *Id.* at 192.

### iii.   *Collateral-order doctrine expansions outside the rulemaking process create their own separation-of-powers issues.*

We conclude by echoing our sister circuits' observation—drawn from the Supreme Court's own words—that if the collateral-order doctrine is to be extended, rulemaking is the right way to do it. *See, e.g., Mohamed*, 100 F.4th at 1227. Despite the Supreme Court's insistence that its limitations on *Bivens* claims protect Congressional prerogatives, Congress has not taken "affirmative action" to undo the Court's early *Bivens* cases. *Bivens*, 403 U.S. at 395. What Congress *has* done, twice, is facilitate the Court's ability to use a rulemaking process to allow new categories of interlocutory appeals. *See* Federal Courts Study Committee Implementation Act of 1990, Pub. L. No. 101-650, § 315, 104 Stat. 5104, 5115 (codified at 28 U.S.C. § 2072(c)); Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 101, 106 Stat. 4506, 4506 (codified at 28 U.S.C. § 1292(e)). The Court has recognized the benefits of this process and has gone so far as to call rulemaking "[t]he procedure Congress ordered" for determining which decisions merit interlocutory appeal. *Swint*, 514 U.S. at 48.

So while *Bivens*-extension orders purportedly offend the separation of powers, collateral-order doctrine expansions outside the rulemaking process create separation-of-powers problems of their own. Congress has instructed us to use rulemaking rather than

23-10252              Opinion of the Court                    43

adjudication to identify new categories of immediately appealable orders. It would be strange to listen to the "congressional silence" about *Bivens* remedies, *cf. Ziglar*, 582 U.S. at 131, and somehow hear a congressional command to end-run two enacted statutes. We decline to take that approach here.

## VI.    Conclusion

The *Bivens* order here can be effectively reviewed after final judgment. The order does not address (and does not foreclose) qualified immunity, so it does not endanger the types of exceptional interests that need immediate review. If *Bivens* defendants seek immediate review outside the normal qualified-immunity path, § 1292(b) offers a way to get it; if the judiciary determines immediate review should be extended to *Bivens*-extension orders as a class, it can promulgate a rule doing so. As for us, we conclude that the collateral-order doctrine does not cover *Bivens*-extension orders that do not address qualified immunity.

We dismiss the appeal for lack of appellate jurisdiction.

**DISMISSED.**